IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS (EL PASO)

UNITED STATES OF AMERICA,          .   Case No. 3:26-MJ-01643-RFC
                                   .
              Plaintiff,           .        **FILED**
                                   .
                                   .        May 22, 2026
        v.                         .
                                   .   CLERK, U.S. DISTRICT COURT
                                   .   WESTERN DISTRICT OF TEXAS
EDITH MARIE DOMINGUEZ,             .
                                   .   BY: _____Belinda Gamez_____
                                   .                     DEPUTY
           Defendant.              .
                                   .   Monday, April 27, 2026
. . . . . . . . . . . . . . . . .  10:35 A.M.


        TRANSCRIPT OF PRELIMINARY AND DETENTION HEARING
           BEFORE THE HONORABLE ROBERT F. CASTANEDA
            UNITED STATES MAGISTRATE COURT JUDGE



APPEARANCES:

For the Plaintiff:        United States Attorney's Office
                          BY: ERIN VAN PELT, ESQUIRE
                          700 East San Antonio Avenue, Suite 200
                          El Paso, Texas 79901
                          (915) 534-6884

For the Defendants:       Sean Wang Law Firm, PLLC
                          BY: SHUHAO SEAN WANG, ESQUIRE
                          1216 Montana Avenue
                          El Paso, Texas 79902
                          (915) 910-6776

Deputy Clerk:             Veronica Montoya
                          United States District Court
                          525 Magoffin Avenue, Suite 105
                          El Paso, Texas 79901

Transcription Service:    Liberty Transcripts
                          9107 Topridge Drive
                          Austin, Texas 78750
                          (847) 848-4907
                          DBPATEL1180@GMAIL.COM


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

INDEX

                                                            PAGE

Case called                                                    3
Court's Ruling on Probable Cause                              27

Arguments on Government's Motion To Detain
   By: Ms. Van Pelt                                           27
   By: Mr. Wang                                               31
Court's Ruling on Government's Motion To Detain               33

End of Proceedings                                            34
Certification of Transcriber                                  35


WITNESSES FOR THE GOVERNMENT:

ALEJANDRO TRUJILLO
   Direct Examination by Ms. Van Pelt                          3
   Cross-Examination by Mr. Wang                               18
   Examination by the Court                                    25
   Cross-Examination Continued by Mr. Wang                     26

WITNESSES FOR THE DEFENDANT:

 (None)


EXHIBITS:                                    Marked    Admitted

EXHIBITS FOR THE GOVERNMENT:

1 - Photograph of Cell Phones                   12         12
2 - Photograph of Inside of Stash House          9          9
3 - Photograph of Dining Area                   10         11


EXHIBITS FOR THE DEFENDANT:

 (None)

**EL PASO, TEXAS, MONDAY, APRIL 27, 2026, 10:35 A.M.**

COURTROOM DEPUTY:  All rise.

THE COURT:  Have a seat, please.

We'll call Case Number 26-01643, United States of America versus Edith Marie Dominguez.  Announcements, please.

MS. VAN PELT:  Good morning, Judge.  Erin Van Pelt and Lisa Klausen (phonetic) on behalf of the United States.  We're ready.

THE COURT:  Good morning.

MR. WANG:  Good morning, Your Honor.  Sean Wang for Edith Dominguez.  We're ready.

THE COURT:  Good morning.  Call your witness.

MS. VAN PELT:  Thank you, Your Honor.  The Government calls Alejandro Portillo.

ALEJANDRO PORTILLO, GOVERNMENT'S WITNESS, SWORN

THE COURT:  Thank you.  Go ahead.

MS. VAN PELT:  Thank you, Judge.

DIRECT EXAMINATION

BY MS. VAN PELT:

Q    Good morning, sir.  Would you please state and spell your name for the record?

A    Alejandro Portillo, A-L-E-J-A-N-D-R-O P-O-R-T-I-L-L-O.

Q    And where do you currently work?

A    With the U.S. Border Patrol.

Q    How long have you worked for the U.S. Border Patrol?

A    Sixteen years.

Q    And what are your current duties with the Border Patrol?

A    I'm currently assigned to the Sector Prosecutions Unit.

Q    Previous to being assigned to the Prosecution Unit, did you have various other roles within Border Patrol?

A    Yes, I have.

Q    Did that include investigations into alien-smuggling?

A    Yes.

Q    Now are you here today to testify in the case of the United States versus Edith Marie Dominguez?

A    Yes.

Q    Are you the Prosecution Agent for that case?

A    Yes.

Q    As part of your duties as the Prosecution Agent, have you reviewed records related to that case in the arrest of Ms. Dominguez?

A    Yes.

Q    Did those records include photographs and identifying information about the Defendant Edith Marie Dominguez?

A    Yes.

Q    Have you reviewed all of those records?

A    Yes.

Q    Based on your review of those records, can you identify the Defendant here today?

A    Yes.

Q    Can you identify her by an article of clothing and where she's sitting in the courtroom?

A    Yes.  She's wearing a red jumpsuit sitting with the Defense table.

Q    Thank you.

MS. VAN PELT:  Your Honor, may the record reflect that the witness has identified the Defendant Edith Marie Dominguez?

THE COURT:  Yes, ma'am.

MS. VAN PELT:  thank you.

BY MS. VAN PELT:

Q    Okay, Agent Portillo, for what charges was Defendant Dominguez arrested?

A    For harboring illegal aliens.

Q    And when did her arrest take place?

A    On April 20th, 2026.

Q    Now what charges was she arrested for?

A    For it's going to be 8 U.S.C. Section 24, Harboring Illegal Aliens.

Q    Okay.  Now where was she arrested?

A    On April 20th, 2026.

Q    And what part of El Paso was she arrested?

A    She was initially arrested or encountered by U.S. Border Patrol a t a convenient store located at the 10300 block of Kenworthy.

Q    Okay.  Is that within the Western District of Texas?

A    Yes, it is.

Q    Now how did Border Patrol agents begin their investigation that led to Ms. Dominguez's arrest?

A    So on that same day, on April 20th, Border Patrol agents were conducting surveillance and preparing to execute a search warrant at residents located at the 10400 block of Bon Aire Drive.  During their surveillance, they saw the Defendant and another subject exit the residence, load into a black Silverado, and go inside into a supermarket.

Q    Now were agents familiar with that black Silverado?

A    Yes, they were.

Q    Now, as agents continued surveillance, what did they do in terms of following the Defendant?

A    They followed the Defendant inside the supermarket and they were able to positively identify the Defendant and the other subject, or the other Defendant or the other person that was with her, as well.

Q    And do you know the name of the other person who was with her?

A    Yes, it's going to be Martinez-Tovar.

Q    Okay.  Now was he arrested, as well?

A    Yes, he was.

Q    Is Martinez-Tovar a United States citizen based on your review of the information contained in this case?

A    No, he was determined to be a citizen of Venezuela without any legal documentation.

Q    Okay.  Now after agents encounter Ms. Dominguez, what do they do next?

A    They notified her of the search warrant for the residence and asked if anyone else was inside the residence.

Q    And what was Defendant Dominguez's answer?

A    She notified agents that her younger siblings were there along with construction workers.

Q    Okay.  Now do agents go ahead and serve the search warrant at that point?

A    Yes, they do.  They go back to the residence and once they arrive at the residence, they knock and notify all occupants inside the house about the search warrant and that they were entering.

Q    Okay.  Now when agents entered the residence, did they encounter individuals within the residence?

A    Yes.  Upon entering the residence, they noted that the residence was very poorly maintained.  There was trash around the residence along with clothing and dark -- and dark covers on the windows, which are typical for a stash house.

     On a preliminary search of the house, they also found a total of 13 occupants inside the residence.

Q    Okay.  Now were all of those occupants adults?

A    No, they weren't.

Q    Okay.  Were there juvenile United States citizens found in the residence?

A    Yes.  So there was a total of 10 adults inside the residence that were determined to be illegal aliens, one juvenile illegal alien.  And the other two juveniles were U.S. citizens, and they were determined to be the Defendant's siblings.

Q    Now based on your review of the records for the juvenile siblings, who were they released to?

A    To a family friend by a last name of Salas.

Q    Okay.  And in terms of the adult aliens who were found in the home, based on your review of the records in this case, did any of those aliens have a previous criminal history?

A    Yes.  I ran the criminal history on all the illegal aliens.  There was one illegal alien from Brazil that was found to have an assault with a sexual offense charge and conviction.

Q    Now you testified about the conditions of the residence. Were those conditions consistent with what you have seen in your 16 years with Border Patrol with a stash house?

A    Yes.  In my experience, that's usually a stash house is very poorly maintained with a lot of trash around the area.

Q    Did agents take photographs during that search warrant?

A    Yes, they did.

Q    Okay.  I'm going to ask you to look in the binder in front of you and ask you to flip to the second page to what I've

previously marked as Government's Exhibit 2.

Now are you familiar with Government's Exhibit 2?

A    Yes.

Q    Was this a photograph that was taken during a search warrant on Bon Aire Drive?

A    Yes.

Q    And other than adding the Government's exhibit sticker to it, has it been altered or tampered with in any way?

A    No.

Q    Is this a true and accurate reflection based on your review of the records of the conditions that agents found inside that home?

A    Yes.

MS. VAN PELT:  Okay.  Your Honor, upon -- the Government has previously tendered a copy of Government's Exhibit 2 to Defense, so without any objection, I would move to admit Government's Exhibit 2.

THE COURT:  All right.  Any objection?

MR. WANG:  No objection.

THE COURT:  All right, it will be admitted.

MS. VAN PELT:  Thank you.

(Government's Exhibit Number 2 admitted into evidence

BY MS. VAN PELT:

Q    Now I'm going to ask you to turn the page inside the -- or let me first do this.  In terms of Government's Exhibit 2, can

you describe for the record what we see in Government's Exhibit 2?

A    In Exhibit 2, it appears to be a room with a bunch of clothes, trash spread all over the place, pills on the floor, blankets on the floor, as well.

Q    And in the window contained in Government's Exhibit 2, do we see that there are curtains and although they are opened, there are curtains over this window?

A    Yes.

Q    Okay.  Is Government's Exhibit 2 consistent in your training and experience with a room you may find inside a house being used as a stash house?

A    Yes.

Q    Okay.  Now I'm going to ask you to turn to the next page. Do you see there on the photograph that I've marked as Government's Exhibit 3?

A    Yes.

Q    Okay.  And based on your review of the records in this case, other than the Government's exhibit sticker that I've placed on it, is this a true and accurate depiction of what agents observed on Bon Aire Drive?

A    Yes.

Q    Okay.  And does it appear to be altered or tampered with in any way?

A    No.

MS. VAN PELT:  Okay.  Your Honor, I've previously provided a copy of Government's Exhibit 3 to Defense, so I would move to admit Government's Exhibit 3.

MR. WANG:  No objection.

THE COURT:  3 is admitted.

MS. VAN PELT:  Thank you, Your Honor.

(Government's Exhibit Number 3 admitted into evidence)

BY MS. VAN PELT:

Q    Agent, would you please describe Government's Exhibit 3 for the Court?

A    It appears to be a dining area with a bunch of clothes scattered throughout the floor.

Q    Okay.  And you mentioned a bunch of clothes.  Is that kind of on the bottom right-hand side of Government's Exhibit 3?

A    Yes, it is.

Q    Is that consistent in your training and experience with the residence that's been utilized as a stash house?

A    Yes.

Q    Okay.  Now as well inside the home, was there any other evidence of smuggling that was located within that residence?

A    Yes.  Once the residence was secured, there was a more thorough search that was conducted on the residence, and agents also found a box of unclaimed or abandoned cell phones.

Q    Okay.  I'm going to ask you to turn to the first page in the binder that I've placed before you to a photograph that I

have labeled as Government's Exhibit 1.  Are you familiar with Government's Exhibit 1?

A    Yes.

Q    Other than the exhibit sticker I've placed on it, does it appear to have been altered or tampered with in any way?

A    No.

Q    Based on your review of the records in this case, is this an accurate depiction of what agents located during their search of the residence on Bon Aire Drive?

A    Yes.

MS. VAN PELT:  Your Honor I've previously provided a copy of Government's Exhibit 1 to Defense Counsel.  At this point, I would move to admit Government's Exhibit 1.

MR. WANG:  No objection.

THE COURT:  Number 1 will be admitted, also.

MS. VAN PELT:  Thank you, Judge.

(Government's Exhibit Number 1 admitted into evidence)

BY MS. VAN PELT:

Q    Agent Portillo, approximately how many phones were found in this box, if you know?

A    Exact number of phones, I do not know.  But on a quick count from what shows on the picture and not any additionally phones that were found throughout the house, it appears to be at least 20 phones.

Q    Okay.

THE COURT:  At least how many?

THE WITNESS:  Twenty.

THE COURT:  Thank you.

BY MS. VAN PELT:

Q    And were there phones located throughout the residence, not just in this box in the attic?

A    Yes.

Q    Do you know approximately how many phones were -- how many abandoned or lost cell phones were located in the residence?

A    No, I don't.  The exact number, no.

Q    Okay.  Now were any ledgers located inside the residence?

A    Yes.  There was approximately three ledgers found inside the residence, as well.

Q    Did you review any reports related to what was contained in those ledgers?

A    Yes.

Q    And did the ledgers give an approximation of how much proceeds had been gained for alien smuggling?

A    Approximately, there was about $248,000 plus in proceeds either that was marked on the three ledgers.

Q    Now was there also a safe located in the residence?

A    Yes.

Q    Did agents receive consent to open that safe?

A    Yes.

Q    What was located inside the safe?

A    Within the safe, they found three handguns and an additional $10,000 worth of cash.

Q    Were there any other firearms located within the home?

A    Yes.  There was also a long fire rifle located within one of the bedrooms, as well.

Q    Inside one of the bedrooms?

A    Yes.

Q    Was there ammunition located in the home?

A    There was over 500 rounds of ammunition of different calibers found within the residence, as well.

Q    Based on your review of the records, would it be calibers that matched the firearms that were found?

A    Yes.

Q    Okay.  Now did the Defendant, did Defendant Dominguez agree to provide a statement after being advised of her Miranda warnings?

A    Yes.

Q    What did she tell agents about her involvement in possible alien smuggling?

A    The Defendant claimed to have started helping and working with her mom approximately a year ago in housing and transporting illegal aliens.

Q    And did she herself pick up illegal aliens?

A    Yes.  She was in communications with a co-conspirator, as well, where she would be instructed to go pick up illegal

aliens at an apartment complex or at Memorial Park.

Q    And what did she say about the aliens that were found in the home that day on April 20th?

A    The illegal aliens that were found at the residence during that day, she claimed that she received them within the past weekend, starting Thursday I believe it was on April 16th.

Q    Now were these the only aliens that she had smuggled?

A    No.  She also claimed that she has received -- since October of 2025, she received approximately at least 50 illegal aliens to include unaccompanied children, as well?

Q    Now you said that that included unaccompanied juveniles. Is that right?

A    I believe, yes.

Q    And was a juvenile in fact found during the execution of this residential search warrant?

A    Yes.  There was one illegal alien that was found to be a juvenile.

Q    Now did Defendant Dominguez tell agents anything about transporting illegal aliens within El Paso and within the greater Southwest area?

A    Yes.  She also admitted to transporting or assisting in the transporting of illegal aliens to Albuquerque, New Mexico and that she would act as a scout for her mom.

Q    And when you say a scout, based on your training and experience in Border Patrol, what does that mean?

A    Typically, within alien-smuggling organizations, they commonly use a tactic which uses multiple vehicles.  The lead vehicle will probably be a scout vehicle, and their main job is to inform other drivers of any heavy presence of law enforcement in the area or to -- and they also notify of the operations of the immigration checkpoints on major highways.

Q    Okay.  And do you know, based on your review of this case, which checkpoint they would typically utilize or that they would pass through, she would pass through as a scout?

A    Yes.  She -- on the vehicles that she was encountered and she would typically pass through the checkpoint on, New Mexico State Road 185 which circumvents the major checkpoint on I-25.

Q    And are you familiar with that checkpoint based on your previous experience within Border Patrol?

A    Yes.

Q    Now did she utilize the black Silverado or was another vehicle utilized in this scouting operations?

A    There was another vehicle that was utilized.  The black Silverado will mainly be operated by her mom.  And once she will pass the checkpoint, she would mainly return back to El Paso and her mom will continue to Albuquerque.

Q    Okay.  Now did Defendant Dominguez tell agents anything about the second defendant, Martinez-Tovar?

A    Yes.  The defendant claimed that the second defendant would be in charge of the residence when no one else was

available and will also be instructed or tasked to take verification videos and submit them to either the mom or other smugglers.

Q    Now do you know whether or not the Defendant Dominguez granted agents consent to look inside her cell phone?

A    Yes.

Q    Okay.  And were agents able to locate additional evidence that corroborated her statement to agents?  Or to locate evidence that corroborated what she told agents?

A    Yes.

Q    Okay.  Now I want to go back to one thing.  The juvenile siblings, they were released to Salas.  Is that correct?

A    Yes, they were.

Q    Do you know whether or not they are currently or whether or not there was another family friend who was involved in caring for the juvenile siblings who were released from the scene?

A    Not to my knowledge.

Q    Okay.  Now are you familiar with a woman by the name of Samantha Rucker (phonetic)?

A    Yes.

Q    How are you familiar with Samantha Rucker?

A    She is currently under investigation right now, involved in with the case.

Q    Okay.  She's under investigation by Border Patrol?

A     Yes.

Q     Okay.  Is that an ongoing investigation?

A     Yes.

          MS. VAN PELT:  May I have a moment, Your Honor?

          THE COURT:  Sure.

          MS. VAN PELT:  Thank you.

     (Pause)

          MS. VAN PELT:  I pass the witness at this time, Judge.

          THE COURT:  Regarding this lady, is there some connection to this case?

          MS. VAN PELT:  Yes, Judge.

          THE COURT:  Are you going to prove it up later or?

          MS. VAN PELT:  I plan on bringing it up when we talk about detention.

          THE COURT:  All right.

          MS. VAN PELT:  Thank you, Judge.

                    CROSS-EXAMINATION

BY MR. WANG:

Q     Good morning, Agent.

A     Sir, how are you doing?

Q     I want to start by asking you about the beginning of this operation.  The agents were executing a search warrant on this house, right?

A     Yes.

Portillo - Cross

Q    And they saw the Defendant leave the house?

A    Yes.

Q    Okay, and they followed her to a supermarket?

A    Yes.

Q    How many agents followed her to the supermarket?

A    I don't know.

Q    Did they follow her into the supermarket?

A    Yes, they did.

Q    And then she left and she went to a different store?

A    Yes.

Q    What was the store?

A    It was a -- it was another store off of Kenworthy.  I believe it was a Dollar General or a Family -- Family Dollar, somewhere around the area.

Q    And she was detained after she and the co-defendant left that store?

A    Yes.

Q    How many agents detained her?

A    I don't know the exact number of agents that were there.

Q    And was she detained when the agents approached her and asked her citizenship?

A    Yes.

Q    The co-defendant during their conversation claimed to be a citizen of Venezuela, illegally in the United States.  Did that co-defendant make any other statements at that time about

Ms. Dominguez?

A    No, not to my knowledge.

Q    And the agents asked her her citizenship and asked the co-defendant his citizenship after they were detained, right?

A    Yes.

Q    I want to ask you about the search of the house.  First of all, the pictures in Government's Exhibits 1 through 3, they were taken after the execution of the search warrant?

A    Yes.

Q    And the search warrant was directed at the house, right, not Ms. Dominguez?

A    Correct.

Q    As to consent to open the safe where you found some of the guns and the money, who gave that consent?

A    The Defendant.

Q    And how did agents open the safe?

A    I don't know.

Q    As to the guns found in the safe, you don't know who those guns belong to?

A    No, I don't.

Q    As to the 10 or 11 thousand dollars found in the safe, you don't know who that money belonged to?

A    No, I don't.

Q    Where was the safe in the house?

A    The exact location, I do not know where it's at.

Q    How far was it from the rifle?

A    I don't know, sir.

Q    How far was the safe from the ammunition?

A    I don't know.

Q    As to the illegal aliens found in the house, you mentioned there was one juvenile illegal alien?

A    Yes.

Q    Was that juvenile illegal alien also a member of Defendant's family?

A    It didn't say on the report if he was part of the family or not.

Q    Do you have any indication that that juvenile illegal alien was unaccompanied?

A    Repeat that question one more time.

Q    Was the juvenile alien that was found in the house, was he unaccompanied by an adult or family member?

A    At the time, he was an unaccompanied juvenile.

Q    It sounds like mom might be involved in these activities?

A    Who?

Q    Ms. Dominguez's mom?

A    Yes.

Q    When did she leave that residence?

A    Exactly when she left, I do not know.  I know that she's out of the country now in Venezuela.

Q    Do you have any indication as to when she left the

country?

A    No, I don't.

Q    Has she been living at the house until April of this year?

A    No, I don't know.

Q    For all you know, there's no indication that mom was not living at the house until April?

A    Right.

Q    It sounds like Ms. Dominguez gave a pretty thorough statement as to her involvement?

A    Yes.

Q    How long was that interview?

A    Timewise, I don't know exactly how long it was or lengthwise.  It was -- or it was around 215 sworn statement questionnaire, and it was approximately maybe about four pages long.

Q    As to money, she didn't make any admissions that any of the money from the alien activities went to her personally?

A    No, nothing was mentioned about money.

Q    I'm sorry?

A    No.

Q    As to the ledgers indicating $248,000 from proceeds, you don't have any indication that any of that went to Ms. Dominguez, correct?

A    Correct.

Q    I want to ask you about Ms. Rucker.  You mentioned she's

under investigation by Border Patrol?

A     Yes.

Q     For what?

A     Her involvement within the case.

Q     What is the allegation that she is -- what's the allegation against her?

A     Allegation?

Q     Against Ms. Samantha Rucker.

A     Ms. Rucker, I don't know if I could talk about the actual information about the case itself, just because it is an ongoing investigation.  But she was involved attempting to retrieve the unaccompanied juvenile that was found at the residence.

Q     Was the attempting to retrieve the unaccompanied juvenile in this case from a detention facility?

A     Yes.

Q     Was she -- how did she attempt to retrieve the juvenile?

          MS. VAN PELT:  Your Honor at this point, I'm going to object to relevance for this particular Defendant.

          THE COURT:  Overruled.

          THE WITNESS:  Can you repeat the question?

BY MR. WANG:

Q     How did she attempt to retrieve the juvenile from the detention facility?

A     She went to, it's called the Office of Refugee

Resettlement, other known as ORR, which they're in charge of housing unaccompanied illegal alien juveniles.

Ms. Rucker arrived at the facility, claimed to be in association with ICE and working with ICE, and attempting to retrieve the juvenile that was found at the residence.

Q    The officer that she went to, is that the office that someone needs to go to if they wanted to try to get someone released from ICE custody?

A    They're held at that office.  Exactly who or how they retrieve them, I don't know that.  That's not part of my -- I don't work within the office.

Q    And the juvenile was not released to her?

A    No.

Q    Is there any other allegation against Ms. Rucker at this time?

A    At this time, she -- I guess she claimed to be working directly as ICE and impersonating an ICE agent.  And besides that, that's about it.

Q    Since she -- since the allegation relates to a juvenile in this case, the investigation against Ms. Rucker started no earlier than April 20th?

A    Yes.

            MR. WANG:  That's all the questions I have, Judge.

            THE COURT:  Ms. Van Pelt, anything else?

            MS. VAN PELT:  No, Your Honor.

EXAMINATION

BY THE COURT:

Q    Agent?

A    Yes, sir?

Q    Did you all ask this Defendant about the guns?

A    No.  The guns were found inside the safe where she claimed that she safe belonged to her mother, the three handguns.  And then the rifle was found within the main bedroom.

Q    But --

A    As to --

Q    But did you ask her if she knew anything about the guns?

A    No, sir, not to my knowledge.

Q    Did anyone ask her about the money that was found inside the safe?

A    She did say within the safe that there was money inside the safe, as well.

Q    Did you ask her about her mother's whereabouts?

A    Yes.  She did state that her mother was in Venezuela right now.

Q    And did you ask her anything about the ledgers?

A    No, sir.  It wasn't annotated during her interview.

Q    Did you look into her criminal history?  Do you know if there's anything?

A    Yes, sir.  She has no criminal history at all.

Q    Do you know of any other weapons have been involved in

this conspiracy, based on your investigation?

A    As of right now, sir, I do not know.  I know they requested the registration for the weapons through a serial number, as well.  We're just waiting for the results on that, as well.

Q    Did she have a cell phone?

A    Yes, she did.

Q    Did you go through it?

A    The agents that were at the -- during the investigation or the field agents, they are currently going through her cell phone as -- or during this time.  They're still gathering evidence.

Q    Okay, all right.

         THE COURT:  Anything else, Ms. Van Pelt?

         MS. VAN PELT:  No, Your Honor.  Thank you.

         THE COURT:  Mr. Wang?

         MR. WANG:  Briefly, Your Honor.

                   CROSS-EXAMINATION CONTINUED

BY MR. WANG:

Q    You mentioned she told you about the money in the safe?

A    Yes.

Q    Did she make statements as to the source of that money?

A    No.

Q    She didn't say that that money was hers and her sister's, that it belonged to them from babysitting and birthday money?

A    She didn't mention anything like that.  She did mention that it was her money for her college fund.

MR. WANG:  That's all, Judge.

THE COURT:  All right, thank you.

THE WITNESS:  Yes.

(Witness excused)

THE COURT:  Any other evidence?

MS. VAN PELT:  No, Your Honor.  I would just ask that --

THE COURT:  Mr. Wang, do you have any witnesses or evidence?

MR. WANG:  No, Your Honor.

THE COURT:  All right.  I have a Pretrial Report. Any objections to it, Ms. Van Pelt?

MS. VAN PELT:  No, Your Honor.  Thank you.

THE COURT:  Mr. Wang?

MR. WANG:  No objection.

THE COURT:  All right.  Do you have argument regarding probable cause?

MR. WANG:  No arguments as to probable cause.

THE COURT:  Okay, the Court will find probable cause.

Go ahead, Ms. Van Pelt.

MS. VAN PELT:  Thank you, Judge.

Thank you, Judge.  Your Honor, as it pertains to detention in this case, it's the Government's position that

this Defendant is not a good candidate for bond.  It is true that she does not have any criminal history.  It does appear that she has ties to the United States and that the agents in this case do have custody of her passport card.

However, Judge, this Defendant's mother is currently in Venezuela, and it's the Government's position that it would be relatively easy and she does pose a flight risk to leave the country to join her mother in Venezuela.  I understand that the Defendant's juvenile siblings are here in the United States, but it does pose a risk of flight that her mother is in Venezuela and apparently has been there for some time, according to Page 2 of the Pretrial Services Report near the top where the Defendant herself told Pretrial Services that her mother has been in Venezuela since November -- I'm sorry, April 9th.

Now Pretrial Services did reach out to Ms. Dibani Salas (phonetic) who told Pretrial Services that now Ms. Rucker has custody of the Defendant's juvenile siblings.  Pretrial Services the recommends Ms. Rucker as a residence for this Defendant to stay out due to the unsuitability of the house on Bon Aire.

However, as the Court heard, Ms. Rucker is currently under investigation as part of this larger conspiracy investigation.  It's the Government's position that she is not an appropriate guardian for or an appropriate third-party

custodian, rather, since this Defendant is an adult, for Ms. Dominguez.

Now in terms of danger to the community, the Court has heard that there were multiple firearms located in this case. I will -- of course, the Court knows that there's no indication that this Defendant herself utilized a firearm. However, the Court heard that she was acting as a scouting vehicle and that she was relatively experienced in that and that she had been doing it for at least a year or at least since October of 2025 with her mother.

The Court also heard that there were at least ten adult aliens inside this home and multiple firearms within that house, including one that was not located inside of a safe, a rifle, as well as over $10,000 in cash that would allow -- if there's additional cash, that would allow this Defendant to exit the country, flee the country.

There were over 500 rounds of ammunitions found, which does pose a danger to the community. Of course, the Government's aware that there's no allegation that any firearms were used in this case, but they were still possessed by this Defendant.

Further, Your Honor, this Defendant is -- just turned 18 I guess in November of last year. And she admitted to Pretrial Services that she consumes alcohol underage. And while that is not maybe as serious as some things that the

Court has heard, that's still an indication that she's not able to follow the law and not able to follow the rules.

The Court also, I'm sure, reviewed the Pretrial Services Report carefully to note on Page 2 that she was placed into a disciplinary program in her school because of multiple truancies, which does not indicate that she's going to be able to comply with the Court's rules, attend court when she's asked to, and attend court on time.

So because there's not a suitable residence for this Defendant because she poses a risk of flight to join her mother in Venezuela, and because of the danger to the community involved in this case with multiple aliens, acting as a scout vehicle, smuggling juveniles, and firearms located in the home, it's the Government's position that the Court should not grant a bond in this case, should grant the Government's motion to detain, and keep this Defendant in custody.

Thank you, Judge.

THE COURT:  Ms. Van Pelt, let me ask you a couple of questions.  Did you work up the Guidelines?

MS. VAN PELT:  I haven't yet, Your Honor.

THE COURT:  Can you ballpark it off the top of your head?

MS. VAN PELT:  I could, while the Court hears from Mr. Wang.  I don't want to give the Court too much confidence in my ability to do math on the fly.

THE COURT:  Well, I'm not sure that you'll have enough time or enough information to come up with something very concrete.  But give it a shot.

MS. VAN PELT:  Okay.  Yes, Judge, I will.  Thank you.

THE COURT:  And also, what's your take on the halfway house?

MS. VAN PELT:  Your Honor, I know that Dismas Charities does as good a job of possible in terms of supervising individuals.  However, it's the Government's position that's not an appropriate place for her to live, not only for her own safety because she is a young female but because Dismas just -- you know, she could leave at any point. She has connections here in El Paso.

She does have family in Ciudad Juarez that she doesn't hear from very often, but she would have a place to stay if she were able to get across the border and then join her mother in Venezuela.  So it's the Government's position that Dismas is not an appropriate placement for this Defendant.

THE COURT:  All right, thank you.

MS. VAN PELT:  Thank you, Judge.

THE COURT:  Mr. Wang?

MR. WANG:  Your Honor, I did run the Guidelines before this morning, and I have her at 0 to 6 on a very good day, by me, assuming a lot of things go my way.  But it's certainly possibly.

She's been in the U.S. since birth.  She has ties to the community.  She's a senior in high school on track or ideally will be graduating in May.  No criminal history.  She does have a support community, as we can see.  She has family friends showing up that could be helpful to her if she is released, including Ms. Rucker I mentioned before and also her ex-step-father, Mr. Contreras, who is here also and may be able potentially to help.

As the Court pointed out and the Government I think conceded, there's no connection to the guns in the house that the Government has been able to raise here.  No indication that she knew about any of the guns and certainly not the rifle.  So I would ask that the Court follow Pretrial's recommendation, release her to Ms. Rucker.

As to the investigation of Ms. Rucker, it doesn't sound like any charges have been brought currently.  And if the Court does not allow her to live with Ms. Rucker, the other alternative I propose is to just let her go back to the house. The search warrant has been executed at the house.  They took out, one would assume, all of the -- any contraband.

You can see on the Government's exhibits they did a pretty thorough job.  They pulled out all the cabinets in the search warrant, so there's no reason why she can't go back there.  And then I think Dismas is sort of a distant third option.  Thank you, Your Honor.

THE COURT:  Yes, ma'am.  Did you come up with 0 to 6, also?

MS. VAN PELT:  No, Your Honor.  Thank you for the Court's patience.  Judge, a very preliminary guidelines would have her at 41 to 51 months due to the number of aliens just that she admitted to, which was I believe the testimony was at least 50 aliens.  Additionally, because there was juveniles, unaccompanied juveniles, that adds a plus 4 to the Offense Level.

In addition, a dangerous weapon was possessed as well, which brings us up to a Total Offense Level of 24.  She does get an adjustment for a zero-point offender at this time.  But her guidelines calculations are still well above that 0 to 6 months.  And so that would as well pose a risk of flight, in the Government's opinion.

THE COURT:  All right.  The Government's motion to detain is going to be granted, primarily because of continuous involvement in criminality over a long period of time involving juveniles and massive involvement in the conspiracy in a familial way.

I understand that there's a lot of points in your favor, Mr. Wang, for example, her age, her lack of criminal history.  And I also know that you know but she doesn't know that my decision is not final.  So if you want to appeal, there's four district judges and you might get one of them that

go your way, maybe some not your way.  But you know how it works.

MR. WANG:  Yes, sir.

THE COURT:  You can explain to your client that the Government I think was probably going to appeal had they lost this case, so you'll have your final say before the district court if you want.

The Government's reminded of <u>Brady</u> and consequences.

Anything else from the Government?

MS. VAN PELT:  No, Your Honor.  Thank you.

THE COURT:  Ms. Dominguez, you understand that you can appeal my decision to another judge?  And if you want that, you tell Mr. Wang to do it for you.  Okay?

THE DEFENDANT:  Yes.

THE COURT:  All right, we'll be in recess.

COURTROOM DEPUTY:  All rise.

(Proceedings were adjourned at 11:15 a.m.)

* * * * *

CERTIFICATE

     I, DIPTI PATEL, court approved transcriber, do hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and transcribed to the best of my ability.

_____

DIPTI PATEL, AAERT CET-997

Expires: December 6, 2026

Liberty Transcripts                    Date:  May 21, 2026